Judge Grant and I are delighted to welcome Judge Hinkle to the 11th Circuit. We're happy to have him here this week to help us decide these cases. It's a special joy for me to sit with Judge Hinkle since we both have family and ancestral roots in Apalachicola, Florida. We appreciate you coming up here to help us decide these cases this week, Judge. And the first case is United States v. Charlie Green and other appellates. And we've got a lot of lawyers here for this case. I see Ms. McNamara is here for the government. And we're going to start with Mr. Farmer for Green and Harris. My name is Matthew Farmer. I represent Charlie Green. And I'm standing in for Danny Hernandez who represents Nathaniel Harris. I'd like to start with the 924C3 issue. The landscape post-Davis v. United States has changed dramatically. The government relied on the residual clause in large part, if not total part, at trial for the convictions on the three 924C3 counts for Mr. Charlie Green. The issue that remains is whether or not the government may, in the alternative, rely on C3A, which is the elements clause of 924C. And the issue there is whether the predicate crime of RICO conspiracy is a crime of violence under the elements clause. And a case from this court from November 12th of this year, Brown v. United States, found that a predicate of Hobbs Act conspiracy is not a crime of violence under the Elements Act. And the rationale of the Brown case has similar applicability here because the Brown court determined that a conspiracy crime, because there is no element of violence that is necessary to be found for proof of that Hobbs Act conspiracy crime, means that that is not an appropriate 924C3A predicate for the enhancement under the 924 enhanced penalties. And that's because the elements of a RICO conspiracy focus on the agreement to commit a crime. That's correct. Those are the elements. And the rationale is identical to our position on RICO conspiracy. There really is no distinguishing factor between Hobbs Act conspiracy and RICO conspiracy. And in fact, RICO conspiracy goes further. The Salinas court from the United States Supreme Court found that there is no overt act requirement under RICO conspiracy. Now I should say I'm not sure if Hobbs Act conspiracy has an overt act requirement, but in any event, RICO conspiracy does not. It's a totally inchoate crime, and therefore the government's alternative after Davis of reliance on A33BA would not support the convictions for Mr. Charlie Green on counts 4, 17, and 18 as well as the counts now standing in for Nathaniel Harris, his 924 counts. If the indictment had simply charged possessing a firearm during and in relation to one of these murders or kidnappings, that would be an appropriate elements cause count, would it not? It would. If it was linked, if the grand jury indicted a violent crime and that was the link, I would agree. So here the indictment charges the murder. It has this reference to count one, the conspiracy charge, but it also rather plainly charges the murder. Why isn't this just a question of variance and whether this indictment can be read to charge a 924C violation for possessing the gun in connection with the murder? What would have been different? Well, what we have to look under the Sixth Amendment is what the grand jury charged and what the trial jury found, almost like Apprendi. That's the essence of Apprendi, not that this is an Apprendi issue, but still it's a Sixth Amendment issue. And we look to what the jury was asked to find and what the jury did find. And we look at, because under Davis, it's categorical. We look only at the elements of the offense. And what the jury was charged was the elements of RICO conspiracy. Now, there were special sentencing allegations that were incorporated as under count one, the RICO conspiracy count. But those were, I think, pled by the government in the indictment found by the grand jury to support findings for the death penalty, which was in play at the indictment stage, in the pretrial stage. But I'm looking at count three. It charges that Mr. Green knowingly used, carried, and discharged a firearm during and in relation to, and it refers to count one of the Second Supreme Seating Indictment. That's the conspiracy charge. But then it goes on to say, in the course of said violation caused the death of Christopher Jenkins, as defined in Section 111. He told me if all it said was he carried the gun and caused the death of Christopher Jenkins, that would be an appropriate conviction. So why isn't that what the government proved and the jury found? Well, that was Jerry Green, count three. There's two Greens and two Harrises, but same point. And I didn't look back to see if he was convicted on that charge, but I just picked one at random. And it would be the same as count four, which is Charlie Green. And I think the best answer is only that that was pled specifically for the government to plead a 924J count, which would allow for a life sentence or the death penalty if the jury were asked to decide that issue. So to answer your question, although there are specific violent offenses that are pled as special sentencing elements in count one, the jury was instructed on the elements of RICO conspiracy. And under Taylor and under Davis, that's all the jury was asked to do. And the government has to, because they decided to plead RICO conspiracy and not substantive RICO, the government cannot rely on a conspiracy offense as a predicate for any of the 924Cs. Thank you. All right. Ms. Borghetti. Good morning. My name is Attorney Ann Borghetti, and I represent Jerry Green. And I'm happy to tell the court that Mr. Green was acquitted of the murder of Christopher Jenkins. I just went to the first one in the indictment, I understand. That's fine. There were so many issues with Mr. Green that I'm not sure where to start. How about the motion to suppress records relating to the location of certain cell phones? Okay. My argument here… You've got a lot of sufficiency of evidence… Right. But, you know, if we take into consideration the credibility evaluations that are within the province of the jury, those are tough issues for you to overcome. And as far as the evidentiary rulings are concerned, I think we apply harmless error review, and that's going to be difficult, I think, for you to overcome. This appears to be your strongest issue, whether the court… Yes, Your Honor. …declared by denying the motion to suppress records relating to the cell phones. And that was Judge Tom McCown, who is now deceased, God rest his soul. He correctly held that the law enforcement seizure of the real-time location information of those phones by secretly monitoring cell phone signals without first obtaining a warrant violated the Fourth Amendment. However, the judge and the district court said that Mr. Jerry Green lacked standing to challenge and also… So, I guess my question is, how do you have standing to assert a reasonable expectation of privacy in a cell phone that you don't even claim is your own? Well, I think that does…you have a legitimate expectation of privacy if you don't want the phone associated with you. I think that shows the expectation, and I think more so the government was saying it was his phone. I believe Mr. Green gave information that one of the phones was his. In the application that the law enforcement filled out in the state court, they said it was linked to Jerry Green. So, as to…and then Detective Petta said that he believed the phone belonged to Jerry Green, and he went on to say that he did do real-time location information for the phone ending in 2828, and he tracked Green on at least one occasion. So, therefore, they… What test would you have us apply to determine if someone has an expectation of privacy in a phone? I think it's objective test. Right, but objective…just whether they actually had an expectation of privacy? Yes. Okay. So, I believe that the government failed to carry the burden of proving that the information that's submitted against Mr. Green was not derivative from the real-time tracking information, and they're relying on the Leon Goodfaith exception, but I don't believe that that applies here because the application was under Florida law and the order was under Florida law. And I think the Tracy case, which is a Florida State case, is still good law pre-Carpenter. Thank you. Thank you. Before getting Mr. Louderback, we're here for Mr. Harris. Yes, Your Honor. Good morning. Frank Louderback of St. Petersburg on behalf of Mr. Napoleon Harris. We have raised various issues in our brief. I certainly don't have enough time to address them all, but I would like to address a couple that I deem to be most important to us. First of all, I would adopt the argument that has been made on behalf of Charlie Green as to the lack of a crime of violence in the manner in which the RICO conspiracy and, in my case, Count 5, which was the murder of Demetrius Cunningham. That would be the only count that that argument would apply to, but I do adopt that argument. Secondly, as to Count 1, the RICO conspiracy, there were about 10 or 11 special sentencing factors related to Napoleon Harris. The jury only found him responsible for one of those, although the jury had been instructed that in order to find any of the defendants guilty, that they had to find that that particular defendant had either committed or agreed to commit two or more of the specific acts that were listed. Mr. Napoleon Harris was only convicted of the one. He was not convicted of the several others. And also, we ended up then with inconsistent verdicts because he was acquitted in Count 1 of that Count 5 murder. How that happened, I don't know. We raised the issue of inconsistent verdicts in a motion for judgment acquittal. That was denied. I believe that that issue here, at the very least, the government has taken a position that those special sentencing factors were elements of the crime. And if he were only convicted of the one, then I believe that the maximum sentence that he could have or should have received under the RICO conspiracy would be 20 years as opposed to life. Although, actually, my argument would be that the Count 1 verdict should be vacated. One of the other issues we raised is that during the course of the trial, co-defendant Corey Harris entered a plea to two counts of sale and two counts of possession with intent to distribute drugs. Corey Harris was named in Count 2 along with my client in the drug conspiracy. The mid-trial, Mr. Corey Harris entered a guilty plea to those counts, and the court published a stipulation to the jury as to the fact that he had pled guilty to those counts. I objected, moved for mistrial. There was a limiting instruction given, but the case law and the government uses Johnston as their basis. Johnston actually quotes case law from De La Vega that says that the admission of guilty pleas of a co-defendant not subject to cross-examination is generally considered plain error. And in this case, it was objected to. It was preserved. The government argued in their closing about Mr. Green's culpability or Mr. Harris's culpability and how it related to the other co-conspirators as to Count 2. Also, as to the drug quantities, there was extensive argument at sentencing. I won't go back and try to argue all that again, but there was a special sentencing factor of the weight of the heroin. The jury found that Mr. Harris was responsible for more than 500 grams but less than 1.5 kilos. At sentencing, he was held responsible for the marijuana conversion on over 20 kilos of heroin. That was objected to at sentencing, and the whole process that was used was objected to. Would his total adjusted offense level have been any different if the court had ruled in your favor? Well, as to just the drugs, possibly depending on how far we ended up coming down, because there's a very complicated grouping exercise as well as the conversion to get to the marijuana weight that eventually got us to level 38, I believe. We could have been as low as a 34, and I think when you did the grouping, he ended up with a total offense level of 43. Obviously, he needed to get below that to get out of the life sentence range. All right. Thank you. Thank you. Counsel, Mr. Brunvan? Good morning, Your Honor. Bjorn Brunvan representing Corey Harris. As the court knows, Corey Harris was acquitted of the RICO and the murder. He was also found guilty of a lesser-included drug conspiracy that did not include any minimum mandatories. Leading up to the sentencing hearing, and this is part of the sentencing record, the defense, the government, as well as probation, met to try to see if we could arrive on what would be an appropriate guideline range and proposed sentence. An agreement was made, and Judge Kovachevich has sent us out to basically put the agreement in writing. The agreement that basically resulted in a sentencing guideline range of 210 to 262 months was, in fact, adopted by the court. It's our position that the government, as you know, asked for 262 months, which is the top end of the guideline range. They did not ask that the sentence be a variance upward, and I asked for 120 months. Keep in mind that three of the charges that led to the 120-year sentence had a total combined amount of drugs of 1.7 grams, I believe, or thereabouts. It's our position that this sentence is substantially unreasonable, that the court did not procedurally consider the 35 to 53 factors as it should have, and that the court, on its own, varied upward. The court brought us in two or three days later, and quite frankly, when I showed up, my thought was that maybe the court was going to impose a more reasonable sentence. Instead, the court, as the record reflects, basically indicated that the concern the court had was what the 11th Circuit was going to think, and then wanted me to add arguments that were inapplicable. She indicated at that point that it was her view that the government and the defense had filed a joint motion for downward variance. There do appear to be shaky findings on the part of the district court, but the government says that the sentence is substantively reasonable because of your client's participation in the Coleman murder, and that alone was enough of a reason to justify the imposition of a life sentence. Yes, and number one, the government did not argue that. They did not propose that that would be a reasonable sentence, that he should get anything as it relates to that. Number two, the evidence is clear that— The government didn't argue that he should get a life sentence? No, the government argued that he should—at sentencing, argued that he should get 262 months. That's what the government argued. They didn't ask for an upward variance. They asked for the high end of the guidelines without consideration for the acquitted conduct, and without a suggestion that Mr. Harris, Corey Harris, somehow had brought this enterprise into Pinellas County. There was absolutely no evidence of that. In fact, as it relates to the murder, there was very compelling evidence that my client was in another county at his home using his phone at the exact time when the murder took place. So it's our belief that the sentence in this case should be reversed for resentencing within the guidelines. Thank you. Thanks, LeBron Van. Mr. Beck? Good morning. May it please the Court. My name is Kevin Beck, and I have the opportunity to represent Deontay Martin this morning. There are a number of issues that are specifically related to Mr. Martin in this matter, and I'd like to raise those and discuss those this morning. The first— The strongest is whether the court erred by permitting LaShawn White to testify about a co-conspirator statement that she overheard. I agree, Your Honor, and I'd like to discuss that first. In that matter, the government had initially intended to introduce those statements because of its belief that LaShawn White had overheard a statement by co-conspirators regarding the names of the shooters of Brenton Coleman. That was objected to at trial, and there was a lengthy in-camera voir dire examination of LaShawn White by both the parties and the court. At the end of the questioning, it was clear both to the court and the parties that, in fact, the comments that LaShawn White was testifying to were street rumors. They were unsubstantiated. There was no indication of where or whom had made those statements, and that they were clearly hearsay. The government acknowledged that upon questioning by the court. It's our opinion that those hearsay statements indicating that Deontay Martin was one of the shooters having been introduced to the jury was prejudicial, significant, and in and of itself would result in a reversible error. However, we're also discussing Walden issues here, too, because we believe there are other errors that occurred. One was a voir dire issue. Because of the nature of this trial, because of the number of parties, although not unprecedented, because of the number of potential jurors that were in the courtroom, there wasn't an inch of free space within the courtroom. So the defense designated Mr. Brunvon and Mr. Lauderbeck to make challenges on behalf of all the defendants. At the very end of the voir dire, Mr. Martin identified a potential juror and asked that he be challenged. That was conveyed to the representatives for the defense, and it was believed that that challenge had been made. In fact, it had not, but there was no opportunity to actually recognize the failure to make that challenge until the jury was, in fact, seated. Not sworn, but seated. At that time, we recognized— You weren't close enough to hear the exercise of the challenge? We stood back and allowed the representatives to do that. This was a packed courtroom with numerous prosecutors and so on. We had peremptory challenges available to us at this time. The pettit jury was seated, not sworn, and at that time, we recognized that the challenge had not been made. We raised it to the court. The court denied our peremptory challenge, not on the basis of procedural or constitutional concerns, but those of expediency. It's our belief that that constitutes error, that the error was prejudicial, and that, in and of itself, would be reversible. So when did the objection take place? It was after everybody had already exercised their peremptory challenges. There were peremptory challenges remaining. However, the court, upon having identified the 12 pettit jurors, seated those jurors finally in the jury box. It was at that time that we recognized that the juror that we had attempted to challenge had been seated, that she had not been challenged peremptorily by representatives for the defense. Were the rest of the potential jurors still there in the courtroom, or had they been dismissed? I believe they had been dismissed at that time. There were very, very few potential word-of-the-hour jurors remaining. In fact, we'd gone through dozens, hundreds of jurors, and that was a concern of the court. I thought it was before you picked the alternates. Did I have that wrong? It was. It was. Well, the jurors had to be there to pick the alternates. Those that we had not already gone through. We had gone through and stricken those in the courtroom dozens with only a handful remaining for alternates. But all of the potential jurors were in the courtroom. Those had already been challenged for cause or peremptorily remained in the courtroom at that time. Before we finished the word-of-the-hour. Were potential jurors who had not yet been dismissed still available to serve in the courtroom at the time that you made the issue? Yes, but just a few. But just a few. I'd like to reserve the remaining arguments for the time that was left. Thank you. You may. Thank you. And Ms. McNamara, you may proceed for the government. May it please the court. Linda McNamara for the United States. Like Mr. Farmer, I'd like to start with the 924C argument because the landscape has changed so much since we filed our briefs and even our supplemental briefs. And Judge Hinkle, I just wanted to address your questions first. The 924C could not be predicated just on state crimes because they have to be crimes for which a person can be prosecuted in the court of the United States. So for our 924C and J convictions to survive Davis, they have to be predicated either on a drug trafficking crime or a crime of violence for which the force is an element, a federal crime. Now, we have three that are predicated on drug trafficking crimes. Those are not at issue here. The remaining are predicated on our racketeering conspiracy. So the question here today is whether those survive Davis. And we have no dispute, we do not dispute, that ordinarily a racketeering conspiracy, just like a Hobjack conspiracy or any other conspiracy, would not qualify as a crime of violence because all it requires is showing a proof of an agreement. But aggravated racketeering conspiracy under Section 1963A adds an element. That provision provides that when a 1962 crime is based on a racketeering act, activity, for which the maximum penalty includes life imprisonment, the statutory maximum penalty increases from 20 years to life imprisonment. And we know from Apprendi and Aileen that if a fact increases the maximum statutory penalty, that fact becomes an element of the offense that has to be charged in the indictment, proven to the jury, and found by the jury. It defines a distinct crime. Now here, it's like the cause of death provision of Section 924J, which this Court has said defines a distinct crime from Section 924C. So what's the extra element that's added here? Section 963A says that when a 1962 crime, substantive or conspiracy, is based on a racketeering activity for which the sentence includes life imprisonment. Now what does that mean, to be based on such an activity? We don't have a statutory definition, but we do have this Court's opinion in United States v. Wynne. That's 255 F. 3rd. 1335. And there, the defendants, like the defendants here, were charged with a racketeering conspiracy based on completed acts of murder. Isn't that case cited in the brief? It is, yes. And it's Wynne, N-G-U-Y-E-N. The defendants there were charged with racketeering conspiracy and completed acts of murder, just as our defendants were here. They were asked on special verdict forms which of the defendants had committed those completed acts of murder, and none of the defendants were convicted of any of those completed acts of murder or any other life sentence, potentially life sentence crimes. This Court said that because of that, because the jury failed to find that any of the defendants had committed a predicate act that had a potential penalty of life imprisonment, the maximum penalty that any of the defendants could have received on each RICO count was 20 years. So from that, we can infer that if any of the defendants had been convicted of a life sentence racketeering act, that they could have been sentenced to an increased statutory maximum. This tells us that the aggravated form of racketeering conspiracy that increases the sentence from 20 years to life imprisonment incorporates the charged life sentence predicate acts and, of course, the elements of those acts. Now, our indictment said that the conspiracy was based on six Florida first-degree murders, one Florida attempted first-degree murder, and two Florida kidnappings. The indictment charged these racketeering acts in the method and means part and as special sentencing allegations. The jury was instructed on the elements of each of those special racketeering acts that increase the statutory maximum, and the special verdict forms asked the jury to find which of the defendants had committed each of those crimes. So the RICO conspiracy charged, proved, and found here included the elements of those underlying predicate acts. Consequently, if those underlying predicate acts constituted crimes of violence, so too did the racketeering conspiracy here. Now, we know that murder qualifies as a crime of violence. They haven't argued that it doesn't, but we know that it does because this court in the United States v. Hyler held that attempted Florida first-degree murder qualifies as a crime of violence no matter how it is committed. So consequently, all of our 924J counts predicated on murder and our 924C counts predicated on attempted murder and the racketeering conspiracy withstand data. Now, they also waived an argument that because Florida kidnapping doesn't include force as an element, a racketeering conspiracy can't be a crime of violence. You see nothing in their brief about whether Florida kidnapping has as an element the use of force. They argue only in general that racketeering conspiracy can never qualify, and that's what's been argued here today. So if they're wrong about that, they can't prevail because they've developed no further argument as to why their racketeering conspiracy dealt with Dan Davis. It's their burden to establish that they're entitled to relief. They stand convicted of racketeering conspiracy, and if they're wrong that racketeering conspiracy can never qualify, they've developed no further argument on that point. So we think that if this court determines that racketeering conspiracy can qualify as a crime of violence, that's the end of the inquiry here. And it's not just a technicality because the fact that they didn't raise this argument means this is not developed anywhere in their brief, and obviously they haven't argued it today. The only place this comes up, whether these Florida state crimes have as an element the use of force, is in the United States brief where I argued in the alternative to the residual clauses that the racketeering conspiracy qualifies as a crime of violence because these underlying predicate acts have force as an element. But even in their reply brief, they do not address whether Florida kidnapping or Florida murder qualifies as crimes of violence. So we think that issue is waived at most to be reviewed for plain error, but we think it's waived. But even if this court reviews for plain or even preserved error the question of whether Florida kidnapping qualifies as a crime of violence, the defendants aren't entitled to release because it does. Now we know from Stoeckling, the Supreme Court has told us in Stoeckling, that the type of force that makes a crime a crime of violence is force capable of causing pain or injury. But Stoeckling also tells us that this type of force occurs when it is force sufficient to overcome a person's resistance. There the court was addressing Florida robbery and the court held that that crime qualifies as a crime of violence because it requires resistance by the victim that's overcome by the physical force of the offender. Now it seems to me that if taking something from a person against their resistance qualifies as a crime of violence, taking the person against his will, which is Florida kidnapping, is a much more violent and physical act, should likewise qualify as a crime of violence. And in fact the Florida kidnapping statute builds in a requirement of physical force because it requires the abduction, imprisonment, or confinement to be against the person's will. Now how do we know that it wouldn't be sufficient if the person's will was overcome by, say, psychological pressure? We know that because confining, imprisoning, and abducting are terms that connote a physical act as opposed to some type of mind control. That Florida kidnapping statute doesn't criminalize, for example, tricking someone into being confined or convincing someone to be confined. It criminalizes physical acts that are met with at least some form of resistance because it has to be against the victim's will. Would it be enough just to lock somebody in a room? I think it would be enough, but I think that even qualifies because that is a physical affront to the person's body, that it's capable of causing harm or injury. And it doesn't have to be significant injury. It doesn't have to actually cause injury. That we know from Stokeling. So isolating someone, locking someone in a room where their liberty is restrained and they have no means of caring for themselves, feeding themselves, access to medication, that type of thing, certainly is a type of physical force to affront to a person that is capable of causing physical harm, at least as significant as Stokeling gives us a slap or a hair pull or a shove as the type of physical force that qualifies. So restraining a person in any means, locking in a room, for example, we think qualifies as a force. And that's what distinguishes the Florida kidnapping statute from the federal kidnapping statute, which this court recently held in United States v. Gillis, does not categorically qualify as a crime of violence. I should note that the mandate has not issued in Gillis, and the United States has moved for an extension of time to file a petition for rehearing. But setting that aside, the federal statute is very different from the Florida statute. It includes, as kidnapping, holding a person by decoy or envigelment. And federal cases holding can be by psychological pressure. So you could have psychological pressure tricking someone into being held. And that's where this court had trouble with the federal kidnapping statute and determined it did not categorically qualify as a crime of violence. But Florida took envigelment out of its statute in 1974. It previously was part of the Florida kidnapping statute, but it's no longer there. It's leaving only the more active forms of kidnapping, abducting, imprisoning, or confining. And the defendants have certainly pointed to no Florida cases suggesting that Florida kidnapping can occur without any type of physical force, either in the initial taking or in their confinement. Now, Florida kidnapping can be committed if the defendant secretly abducts, confines, or imprisons someone. But secretly is not the same as envigelment. The Florida law defines, as stated in the Florida standard jury instruction 9.1, says by secret means that the defendant intended to isolate or insulate the victim from meaningful contact or communication with the public. So that goes to the offender's intent, not to whether or not force is involved. And in any event, we think that separating a person from the public against his will, combined with abduction, imprisonment, or confinement, is surely the type of physical act that qualifies as a crime of violence and can cause a person, is capable of causing a person injury or pain. Therefore, the defendants here have not established that racketeering conspiracy, aggravated racketeering conspiracy, under Section 1963A, does not qualify as a crime of violence, and all of the 924C and J convictions withstand Davis. Now, I wanted to address next the Southside location information issue, unless the Court would like me to go somewhere else. I want to make sure you save some time to talk about Corey Harris and his involvement in the murder. Sure. Let me talk about Corey Harris then next. And we recognize that he was sentenced to a lengthy sentence, despite that he was acquitted of the racketeering conspiracy and any underlying murder charge. And the district court plainly found that he committed the murder. Absolutely did. Yes, she did. And beyond that, his drug convictions alone would have supported the imposition of the sentence that he received. But she pretty clearly sentenced him because she believed he committed the murder. I want to get you to address two things about that. First, she found that he left his phone home, but it was pinging in Palmetto in the afternoon. So I need you to explain to me what your theory is about how that phone was pinging in Palmetto and then back home and why that doesn't indicate that he wasn't involved. And then the other thing I want you to address is Watts. Watts does say acquitted conduct can be taken into account, but it has a discussion of the tail wagging the dog. And when somebody is convicted of three drug offenses, fairly small drug offenses, and then gets convicted of murder and sentenced to life, it sounds to me like that's the tail wagging the dog. Well, remind me to get back then. I'll start with your first questions about the phone. Of course, we don't know what happened with the phone, but this is a seasoned criminal. This man has been committing crimes since he was 11 years old, and I think it's fair to assume that he knew that where his phone was could implicate him in a crime. So if that phone was pinging in Palmetto earlier in the day and back in Pinellas County later in the day, that doesn't mean that he was with the phone. We don't know who was with the phone. That's always an issue with respect to phone evidence. So that is not any type of evidence that proves where he was at any given time. These sophisticated people had another phone within eight meters of the murder. Not him, though. So we don't know. The answer is we don't know how the phone got there. That's always an issue with respect to phone evidence. But we do have him renting that Camaro that was seen crossing the Skyway Bridge on the way to Bradenton, Florida, where this murder took place on that day. We have a picture of it. So why in the better theory that he loaned the car to somebody and then he went back, by some other means, back to his home in Pinellas? What is there in the record, other than Mr. Neri's own testimony, that is inconsistent with the theory that Mr. Neri was the one who committed that murder with Mr. Martin? Well, I mean, we have to rely on Eric Neri's testimony, but we also have video surveillance that's consistent with his testimony about what happened that day, of the Camaro and the Navigator casing the Dream Center that day. That could be Mr. Neri driving the Camaro. It could be. And that's perhaps why the jury acquitted him of that crime. But that doesn't mean by a preponderance of the evidence that the district court couldn't rely on Eric Neri's testimony, which he could. The jury could have relied on that. The jury certainly could have found, based on Eric Neri's testimony, beyond a reasonable doubt that he did. One of the 28 versions. I interrupted Judge Grant, so I was going to get you back to the question about Watts, but I didn't want to interrupt. No, that's fine. Your question was similar to mine. Remind me what your question was about Watts. Watts and why in this tail wagging the dog. Oh, what I wanted to say with respect to that is this is not unusual for a court to be able to significantly enhance a defendant's sentence based on acquitted conduct. In fact, this court in United States v. Overstreet, which we cited in our brief, affirmed essentially a life sentence for a defendant convicted only of a 922G crime, felon in possession, where the district court has found by a preponderance at the sentencing hearing that that defendant had also murdered his wife. I'll bet he wasn't acquitted of it. He may not have been acquitted of it, but the jury's verdicts here sometimes are somewhat hard to understand. And it doesn't matter that he was acquitted of it. If it doesn't matter that he was acquitted of it, then why would a defendant even defend themselves against a murder charge if three smallish drug crimes are going to get them the same sentence in any event? It won't always. It won't always. But here, there was so much evidence that this man was involved in this murder that it was not an abuse of her discretion to take that into consideration in determining that he qualified for a life sentence, particularly in light of the vast quantity of drugs, which he does not challenge here today, and his criminal history, which includes many, many, many drug crimes. Grand theft auto. It includes a sexual battery when he was 18 years old on two 13-year-old girls that he had sex with. He's a registered sex offender. This life sentence, and she didn't obviously discuss all these things in her sentence, and she did plainly rely in large part on the fact that he participated in this murder. Is it true that the government asked for 262 months at the time of the sentence? We agreed with this. I don't know how to explain it. The parties agreed that if the court would sentence him between 210 and 262, Corey Harris would drop all of his objections to the PSR. That's the agreement. So we did agree, and we asked for a sentence of 262 months. Now the fact that that's a reasonable sentence doesn't mean that a life sentence is not also reasonable. There's always a range of reasonable sentences here, and given this man's criminal history and his participation in this murder, which this is a horrible murder. This is at an opening day of a youth football game where there are hundreds of people there, including many, many children. The man that they murdered, that Corey Harris was found by the district court to have murdered, was carrying his child as he was being chased by Corey Harris and Deontay Martin with their guns and fell, and the two men stood over him and shot him. This is a man who needs to be in prison for life, and this was not an unreasonable sentence. As long as he did it. It was not unreasonable for the district court to find here by a preponderance of the evidence that he had done it. In fact, it would not have been. If we were standing here today, if he had been convicted of that crime, we would have no trouble, and I think you would have no trouble finding that the jury's verdict was supported beyond a reasonable doubt based on Eric Neri's testimony alone. If this is not a situation where the tail is wagging the dog, tell me what would be. Well, I mean, I don't know how to respond to that question, except to say that this crime was proven by trial evidence, and the fact that the jury acquitted, we don't know why the jury acquitted. This could have been just some type of jury notification, some type of disagreement, the fact that he was young. We don't know why. We don't know that the jury found that he didn't do this. All we know is that the jury acquitted him, and if the jury had convicted him, I think he would have no trouble affirming that conviction. So I think there's no reason why you should have trouble finding that the district court's determination by a preponderance of the evidence likewise supported the sentence that she imposed. Can I add anything on that issue, anything, any other questions? No, and I interrupted you and got you to Corey Harris. No, that's fine. I'm about to tell us about something else. That's fine. No, I was just going to address the cell tower evidence. I just wanted to talk about that a minute because, again, the law has developed more since we briefed that issue. I do think, however, that this issue also is not sufficiently raised in their brief to merit this court's review. None of the defendants specify in their arguments what phone numbers are at issue here, what evidence was admitted, although they say in their statement of facts, we move to suppress this phone, that phone, and the other phone. Some of those evidence with respect to many of those phones wasn't even admitted at trial. For example, Jerry Green mentions a phone ending in numbers 9395 in his statement of facts, but there was no cell site location information admitted at all with respect to that phone. Same with a phone ending in the number 2828. They can't just say we move to suppress this evidence, the court denied this evidence, and therefore we win. Rule 28 requires the defendant challenging the admission of evidence to cite the places in the record where that evidence was admitted, and they have not done that. Why isn't the good faith doctrine a simpler way to resolve this? It is. I mean, it is certainly a simple way to resolve this, but I guess I feel a frustration here with respect to this issue. And I see this a lot, where defendants raise this type of issue without sufficiently raising it, placing the burden on the United States to do a complete brief, to thoroughly examine, and when you're talking about a three-month trial, to search through a three-month trial to see what evidence was actually admitted so that we can thoroughly respond to the argument. I think it's important that this court enforce Rule 28 and say that this argument is not sufficiently raised. Alternatively, can the government argue that there was sufficient evidence to convict without the cell phone, so any error would be harmless? Absolutely. So the cell phone location information was admitted with respect to two of the racketeering acts and associated 924J crimes. One was the Carlos Jurado murder at the Sheridan Place Apartments, and the other was the Coleman murder at the Dream Center. The Carlos Jurado murder was – Jerry Green was the only defendant convicted of that Carlos Jurado murder, and a witness, Tiffany White, placed him at the scene of the murder in close proximity to Carlos Jurado immediately before the murder. But perhaps more importantly, Jerry Green confessed to a fellow inmate that he'd killed Jurado and was supposed to be paid for it. So setting aside any cell site location information with respect to that, he would still have been convicted of those crimes. Now regarding the Coleman murder, Charlie Green was convicted of the racketeering act of conspiring to murder him, but there was no cell site location information admitted with respect to him. And, of course, Deontay Martin was convicted of the racketeering act of murdering and conspiring to murder Coleman and was also convicted of the 924J charge. But as I said, Eric Neri placed Deontay Martin at the scene of the murder. But in addition to that, we have witnesses who don't name him, but they describe him, and that's important because he is a very distinctive looking man. He had a very distinctive hairstyle. If you look at his PSR, you'll see his picture with his distinctive hairstyle. And numerous witnesses described that person at the Dream Center that day. Moreover, Deontay Martin admitted to a fellow inmate that he'd shot someone at a youth football game. So it's not the cell site location information that resulted in Deontay Martin's conviction here either. Thank you. Speaking of Deontay Martin, how did the government get into evidence Lashawn White's testimony that she heard rumors on the street that Deontay Martin participated in the murder of Brent McColeman? What rule, exceptions, or hearsay rule would permit that to get into evidence? If I can just explain sort of how that came to pass. So on direct examination, Lashawn White testified that a few days after this Coleman murder at the Dream Center, Charlie Green had picked up money at her house, and she'd gone with him to this Big Red's house where he gave the money to Deontay Martin, which is further evidence of Deontay Martin's involvement in that murder. Now, on cross, the court permitted Corey Harris' counsel asked if at the time of this meeting at Big Red's house, she'd overheard that there were two shooters. The question was, and the statement that you overheard at that meeting was that there were two shooters, right? And she says, that wasn't at the meeting that I heard that. So then there was a proffer as to what more she could say about that. And during the proffer, Corey Harris played part of a taped interview for her where she said they were saying it was Tang and Kiwi, that being Deontay Martin and Eric Mary. She explained in the proffer that no one had told her who had killed Coleman, it was just street talk. And then the court permitted Corey Harris' counsel to have this exchange with her. Do you recall being asked by agent Sears the following? They didn't actually say who did the shooting when they were talking. Do you recall being asked that question? Yes, sir. And do you recall giving the following answer? I believe they were saying Tang and Kiwi, yeah, Eric Mary. Then on further cross-examination, she was asked, who is they? And she said, I was talking about the street rumors. No one ever, they never told me who did the murder. So I agree with you, Judge Wilson. I can't think of a way that this comes in, but it's so vague that it's harmless. She's talking about, she was permitted to explain that this was street rumors that she'd been hearing. She didn't say who she'd heard them from. And ultimately, as I've discussed, there was plenty of evidence that Deontay Martin was one of the shooters there that day, that this street rumors thing is not the straw that broke the camel's back as to Deontay Martin's conviction on that charge. The only other thing, I would just briefly respond to Napoleon Harris's argument about the two, not being convicted of two racketeering acts. Indeed, he was. The jury found him guilty of one special sentencing allegation. Of course, we don't have to allege any racketeering acts in the verdict form unless they increase the statutory maximum sentence. We instruct the jury that they have to agree on the racketeering act, and so the jury knows they have to agree. We also instruct the jury on the types of racketeering acts that were involved in the crime and charged. But unless the act increases statutory maximum, they don't have to be set out in the verdict form. We don't need specific findings on that. But we do have findings on that because we have him being found guilty of one of the special sentencing allegations and also the drug conspiracy, which was a racketeering act as well. We have plenty of evidence that he was involved in additional racketeering acts that the jury could find him guilty for as well and likely did. If there's no other questions, I will return my time to the Court. Thank you, Ms. McGrath. Thank you. Mr. Farmer, you have reserved some time for rebuttal. Thank you. The District Court got it right on the 924C3A issue. Before the trial began, we moved to dismiss the 924A3A counts or the counts to the extent that they pled an A offense. That is the elements clause of 924C3. And what we have here is the government arguing that there is a new offense in the federal code called aggravated recalconspiracy. Now, there's no such thing by that name. But the government's point is that by going to 1963, which is the penalty statute that applies to 1962 substantive and conspiracy RICO offenses, that is a sentencing statute. And what it does is it increases the maximum penalty of 20 years from a possible maximum sentence, the sentence of life. If there is a showing that the predicate offense is one that could carry a life sentence. So the government's theory here is that this is a new offense. The element that increases the maximum RICO conspiracy penalty from 20 years to life are these special sentencing allegations that this jury found on the jury verdict form. And I know the government added those special sentencing allegations not only to allow it to pursue a 924J death penalty in the event of a conviction, but also under Apprendi and Allene, which would require a jury finding if the maximum sentence is affected by a fact, would increase from 20 years maximum to life. That's why it was pled. That's why the government complied with Apprendi and Allene to submit that factual finding to the jury with the special sentencing allegations. Now, what's important though is that the grand jury did not plead in this indictment, 1963. Count one is 1962D, RICO conspiracy, and I think that's fatal here because it wasn't – a grand jury did not indict Mr. Green or any of the other defendants for a 1963 offense. And therefore, this new, newly coined, aggravated RICO conspiracy offense, if it does exist under any name, was not indicted by the grand jury in this case. Thank you. Thank you, Mr. Farmer. Ms. Borghetti. Yes, I would just like to reply to the government saying that we didn't sufficiently develop the issues. The reply brief cites to the pages of the brief that cited to the portion of the record that the argument relied on. Some of that was contained in the statement of the case, and to the extent that claiming that that was supposed to be in the argument section rather than the statement of the case section, I think that – I mean, I think the argument section clearly refers back to the facts in the statement of the case. I would just like to add that as to the Carlos Dorado murder, my client, Jerry Green, was found by a jury to have committed that murder but Napoleon – but found not guilty of conspiring to murder Carlos Dorado. And Mr. Lauterbach's client, Napoleon Harris, was found not guilty of the Carlos Dorado. So I think that this cell information that they presented in court prejudiced Mr. Green in that the jury found that he was there based on the phones, and he had standing. One of the things I forgot to say to the court was some of these phones were found in a car that was previously linked to Mr. Green, evidencing possession. So for those reasons, I would ask the court, based on the argument – Why isn't that just a good faith issue? I mean, we've got a case, and I don't have it at my fingertips. There's an 11th Circuit case that comes after Carpenter and says you relied on the system in place. I mean, I understand the argument is traced to the state court, but we don't suppress evidence based on state violations. We suppress evidence based on the Fourth Amendment. I know, but the application and the order were approved by a state judge, a state court judge, so I think you have to honor that. If they had called an application for a warrant and the judge had changed the title on the top and said it was a warrant, wouldn't the judge have issued the warrant? Probably, but they didn't act in good faith, and they even said that. They said they wanted a pen register and trap and trace, but really what they did was like a GPS tracking of the phone. So they were not, and they admitted that in the suppression hearing. But it's right in the application. It's right in the order. Do you think the judge didn't read the application and the order before signing it? I don't know. Thank you. Your Honor, back. I, too, am confused about the government's attempt to bring into this RICO conspiracy charge some other charge. It was quite clear from the way that the government charged it, the way they proved it, the way they argued it, and the jury instructions that this was a single objective conspiracy. The jury was instructed that in their verdict they had to be unanimous as to which type or types of predicate racketeering activity that a particular defendant agreed would be committed, and that you must be unanimous as to which type or types of predicate racketeering activity the defendant agreed would be committed. As to the verdicts, as to Mr. Napoleon Harris, they indicated that they found that he had committed the kidnapping of one of the people, but indicated that he had not murdered that gentleman. They indicated in the RICO Count 1 verdict that he had not committed the murder of Demetrius Cunningham, yet they convicted him of the substantive count that charged the same thing. We argued those were inconsistent verdicts, but clearly charging this and proceeding in the manner in which they did, those special sentencing factors became apprendi factors, and the jury found only one of those, not two or more, as it pertained to Mr. Napoleon Harris, and therefore I think that clearly at a minimum he would have to be resentenced as to count 1 to no more than 20 years that they don't have the enhancer to get him to life. Additionally, as to this other, the charge here was conspiracy to commit racketeering, nothing else. The government is broadening this argument to try to get around the verdicts that acquitted at least Napoleon Harris of the vast majority of the counts against him. All right, thank you. Mr. Weierbach, Mr. Brunvan. Thank you. First of all, the government in this case at sentencing asked for a sentence of less than 22 years. I would respectfully suggest that that was not something that they arrived at just at a moment's notice. It was discussed at the highest levels in their office. We agreed to a compromise on the guidelines, and that's why we're not here talking about the drug quantity amounts. But since it's been brought up, I think it's interesting to note that the reason that the drug quantity amounts attributed to Corey Harris are so high is because he spent the least amount of time being incarcerated during the long period of the conspiracy. That's how they arrived at those high numbers. But the important part here is that the jury got it right. The jury determined that he was not guilty of the Coleman murder. The jury determined that and agreed with the government that Eric Neri couldn't be trusted. The government in the record said Eric Neri can't be trusted. And they agreed that the only person who points the finger at Corey Harris as being a participant most likely was the participant, was the person who actually committed the murder or participated in the murder, not Corey Harris. The suggestion that somehow Mr. Harris travels to Manatee County, clearly he travels to Manatee County. His phones were used in Manatee County in the early afternoon. But the suggestion that when the phones travel back to Pinellas County and are being used in Pinellas County at the time of the murder, that somehow this is some sophisticated plan, it's pure speculation. There's absolutely no evidence to support that. I take it nobody went and checked on the numbers that were being called or communicated with in Pinellas County to see who was on the other end and who they were talking to. That's correct. That's correct. How old is Mr. Harris? Twenty-eight. Thank you. Mr. Beck. Thank you. I'd like to focus on my last argument in regards to what I consider to be a significant error by the prosecution in this matter during closing arguments. I think it also addresses some of the concerns that you have in regards to Mr. Harris and his role in this Brennan Coleman murder. During the closing arguments, the government made the statement, based upon admissions by Mr. Martin, that he had given a firearm to Joshua Smith and that he had identified the location of Brennan Coleman, that, in fact, Deontay Martin could be held responsible for the Coleman murder as an aider and abetter to the conspiracy. Let me make sure I understand. Did you raise this in your opening? I did not get to it. Did the government talk about it? No, they did not. But I do believe it addresses some of the concerns regarding Mr. Harris as well, that being the credibility of Eric Neary. You understand our protocol. I do. We only address what we have discussed before. Let me talk then about the issues that relate to the conviction of Mr. Martin as relates to the totality of the evidence. The government has argued that Mr. Martin was peculiar, that his appearance was peculiar. However, the two shooters at the Coleman murder, in fact, were wearing black T-shirts around their face and head. They were not identified. None of the witnesses at the time of the initial investigation identified these twists or dreadlocks, which are determined to have been the peculiar nature attributable to Mr. Martin at the time of the initial investigation. That information did not come up until trial. And the primary witness, a coach from the Green Center facility, who was the closest to the shooters, who had the best view of the shooters, did not identify these dreadlocks, these twists, or attribute them to anybody. What do you say about the government's contention that LaShawn White's testimony was so vague that it turned out to be pretty meaningless? Its presentation to the jury received the imprimatur of the court through its admission, indicating that it was valid, admissible testimony. The jury knew only that, that it was allowed and presented to them as evidence of Tang or Deontay Martin's guilt in the Coleman murder. It can't be ignored. It wasn't minor. It was clearly prejudicial. Subsequent cross-examination may have affected, may not have, but in and of itself, its admission is so violative of the rules of evidence and so violative of the concerns of a fair and impartial trial that it cannot be allowed to pass, neither independently nor cumulatively, pursuant to U.S. v. Walden. And we would ask that this court reverse and remand this matter to a new trial. Thank you. Thank you, Mr. Beck. And I note that all of you, Mr. Farmer, Ms. Borghetti, Mr. Lauterbach, Mr. Brunvan, and Mr. Beck, you're all appointed by the court to represent the appellants in this case. And the court appreciates and thanks you for your service. Thank you. Good. Champions v. Commissioner of the Internal Revenue Service. Ms. Hoard is here for Champions. And Ms. Brunvan.